*Shaarei Tfiloh Congregation v. Mayor and City Council of Baltimore*,
No. 2645, Sept. Term 2015 and No. 2572, Sept. Term 2016
Opinion by Leahy, J.

## HEADNOTES

**Administrative Law > Administrative Exhaustion and Finality**

When a petitioner exhausts administrative remedies and obtains a final administrative decision, the decision is ripe for judicial review, and there is no need to consider whether exceptions to the exhaustion requirement apply.

**Statutory Construction > Legislative Authority**

A local jurisdiction does not exceed its delegated authority when it implements a law consistent with the provisions and exemptions delineated in the enabling act.

**Statutory Construction > Distinction between Fee and Tax**

An assessment cannot be a user fee or service charge if it is not based on a commodity or service consumed. *See West Capital Assocs. Ltd. P'ship v. City of Annapolis*, 110 Md. App. 443, 450 (1996).

**Statutory Construction > Distinction between Excise Tax and Property Tax**

Our consideration of the operation and effect of the Stormwater Fee does, however, foretell much about its categorization as an excise tax. The General Assembly determined that the proportion of impervious surface area of a property is a proxy for usage of stormwater system services. The charge is based on the particular use of the property—the amount of impervious surface. It is not based on the value of the property or ownership of the property.

**Statutory Construction > Distinction between Excise Tax and Property Tax**

A tax is an excise tax, and not a property tax, when it is based on the particular use of a property, not the value of the property or property ownership.

**Precedent > Stare Decisis**

This Court will not entertain an invitation to adopt and apply a new standard of law in contravention of existing Court of Appeals' precedent.

**Constitutional Rights > Religious Land Use and Institutionalized Persons Act of 2000**

A legislative enactment is not a land use regulation for the purposes of RLUIPA unless it imposes restrictions on the use of the land or regulates the use of the property.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2645

September Term, 2015

&

No. 2572

September Term, 2016

_____

SHAAREI TFILOH CONGREGATION

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE

_____

Leahy,
Reed,
Shaw Geter,

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  April 27, 2018

*Friedman, J., did not participate in the Court's
decision to designate this opinion for publication
pursuant to Maryland Rule 8-605.1.

"If the rain spoils our picnic, but saves a farmer's crop, who are we to say it shouldn't rain?"[1]

This appeal swells out of the controversial law imposing stormwater remediation fees, commonly referred to as the "Rain Tax."[2] The law passed like a tidal wave through the General Assembly in 2012 to fulfill requirements imposed by the United States Environmental Protection Agency ("EPA") in order to reduce pollutants entering the Chesapeake Bay. Under the new state law, Maryland Code (1982, 2013 Repl. Vol.), Environment Law Article ("Envir."), § 4-202.1,[3] local jurisdictions subject to Phase I municipal separate storm sewer system permits ("MS4") were required to create watershed protection and restoration programs and establish stormwater remediation fees by July 1, 2013.

The surge hit Baltimore City ("the City") in early 2013, when the City Council passed Ordinance 13-143, enacted into the Baltimore City Code as Article 27. Pursuant to Baltimore City Code, Art. 27, §§ 3-1(a) and 3-7(b)(1), the Baltimore City Department

---

[1] Tom Barrett, Mayor of Milwaukee, Wisconsin, quoted in Roger Warburton & Vijay Kanabar, The Art and Science of Project Management 474 (2d ed. 2016).

[2] The origins of this politically charged moniker date back at least to the mid-1990's in Grand Rapids, Michigan, where voters opposed a proposed law similar to Maryland's Stormwater Remediation statute. *See* Matt Vande Bunte, *'Rain tax' to be recommended as a revenue stream for Grand Rapids*, MLive (May 23, 2012, 3:27 PM), http://www.mlive.com/news/grand-rapids/index.ssf/2012/05/rain_tax_to_be_recommended_as.html

[3] Citation to the 2013 Replacement Volume reflects the statute at the time that the Shaarei Tfiloh Congregation ("the Congregation") instituted litigation. As we explain later in the opinion, certain provisions have since been amended.

of Public Works ("DPW") was authorized to assess and collect a stormwater remediation fee ("Stormwater Fee") on all non-exempt properties within the City. For the third and fourth quarters of 2013, DPW charged $240 total per quarter for the three properties that are the subject of the underlying appeal, owned by Appellant Shaarei Tfiloh Congregation ("the Congregation").

At the first level of administrative review, DPW denied the Congregation's demand to void the Stormwater Fee as an unconstitutional property tax in violation of the Congregation's rights under state and federal laws protecting the free exercise of religion. Still, DPW granted the Congregation a slight reduction in fees to $150 per quarter. The Congregation appealed DPW's decision to the Baltimore City Board of Municipal and Zoning Appeals ("the Board"), where the Congregation's constitutional challenge was also rejected. Thereafter, the Congregation sought judicial review of the Board's decision in the Circuit Court for Baltimore City, and the court affirmed the Board's judgment. Notably, however, the circuit court ruled that the Stormwater Fee was an excise tax rather than a fee but concluded that such a tax was authorized by the State's enabling law. The Congregation appealed to this Court and presents four questions for our review, which we have reworded and reordered slightly:[4]

---

[4] The Congregation phrased its questions presented as follows:

A.) "Did the Baltimore City Board of Municipal and Zoning Appeals ("BMZA") Err in Holding that the "Stormwater Remediation Fees" Imposed under Article 27 of the Baltimore City Code were valid?"

B.) "Did the BMZA Err in Holding that Article 27 is not a land use ordinance?"

2

1. Did the Board err in holding that the Stormwater Fees imposed under Article 27 of the Baltimore City Code were valid?

2. Did the Board err in holding that Article 27 is not a land use ordinance?

3. Did the Board err by ignoring the broad protections afforded religious institutions under Article 36 of the Maryland Declaration of Rights?

4. Did the Board err in failing to follow its own rules of procedure?

We hold that the City acted within its authority under the state enabling law when it enacted Article 27 of the Baltimore City Code. We agree with the Congregation that despite its name, the Stormwater Fee is a tax because its primary purpose is to raise revenue and because property owners' only obligation under the statute is to pay the charge. However, we hold that the Stormwater Fee is an excise tax, rather than a property tax, because it is based on the particular use of the property, not the value of the property or property ownership. We also hold that Article 27 does not violate the Free Exercise Clause of the Maryland Declaration of Rights and does not implicate the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). Finally, we discern no failure by the Board to follow its established procedures.

## BACKGROUND

Stormwater management undertakes to reduce stormwater runoff's adverse effects on rivers and streams and to protect the public's safety. *See* Envir. § 4-201. Stormwater

---

*Continued . . .*

C.) "Did the BMZA Err in Failing to Follow its own Rules of Procedure?"

D.) "Did the BMZA Err in Ignoring the Broad Protections Afforded to Religious Institutions Under Article 36 of the Maryland Declaration of Rights?"

runoff continues, however, to be a major source of the pollution that flows into the Chesapeake Bay—the largest estuary in the United States. *See* EPA, Addressing Nutrient Pollution in the Chesapeake Bay, https://www.epa.gov/nutrient-policy-data/addressing-nutrient-pollution-chesapeake-bay (last visited Apr. 14, 2018). The federal mandate to protect the Chesapeake Bay and the cascading laws enacted by the State and the City set the course for the case before this Court.

## A. Statutory Framework

### 1. Federal Law

Amid growing concerns of increased water pollution, Congress passed the Federal Water Pollution Control Act of 1972, known as the Clean Water Act ("CWA"), which is codified with amendments at 33 U.S.C. § 1251 *et seq.* (2012). The CWA's purpose "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). Administered by the EPA, the CWA, among other things, prohibits the discharge of pollutants without a permit into the navigable waters of the United States.[5] *Id.* § 1342(a)(1).

The EPA issues permits for such discharges via its National Pollutant Discharge Elimination System ("NPDES"). *Id.* § 1342(a). Pursuant to statute, the EPA may,

---

[5] The "discharge of a pollutant" is defined as "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12) (2012). Navigable waters are "the waters of the United States[,]" and such waters do not include ground water. *See id.* § 1362(7); *see also Assateague Coastkeeper v. Md. Dep't of Env't*, 200 Md. App. 665, 671-672 (2011) ("The [Clean Water Act] regulates discharges to surface water; it does not regulate discharges to ground water because ground water does not qualify as 'waters of the United States.'").

however, delegate its permit-issuing authority to a state government if the EPA accepts that state's proposed permit program. *Id.* § 1342(b). The EPA Administrator approved Maryland's NPDES permit program on September 5, 1974. *See* 57 Fed. Reg. 43,734. Consistent with this grant of authority, the Maryland Department of Environment ("MDE") may issue the various NPDES permits in Maryland. Code of Maryland Regulations ("COMAR") 26.08.04.07.

Although the CWA focused initially on water pollution from industrial sources, Congress amended it in 1987, requiring the regulation of MS4 (municipal separate storm sewer system) stormwater discharge. *See* Pub. L. No. 100–4, 101 Stat. 7 (1987); *see also Md. Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 96-97 n.3 (2016). The EPA issued its NPDES MS4 stormwater regulations for "Phase I" jurisdictions in 1990 and for "Phase II" jurisdictions in 1999. 55 Fed. Reg. 47,990; 64 Fed. Reg. 68,722. As delineated by the EPA, Phase I regulations apply to "large" jurisdictions, classified as those with populations over 250,000 people, and "medium" jurisdictions, those having between 100,000 and 250,000 inhabitants. 55 Fed. Reg. 47,990. Phase II regulations apply to those jurisdictions with populations up to 100,000 residents. 64 Fed. Reg. 68,722. In December 2010, the EPA issued the Chesapeake Bay Total Maximum Daily Load ("TMDL"), a cap on the amount of pollutants related to nutrients—like nitrogen and phosphorus—and sediment that can be discharged into the Chesapeake Bay and its tributaries.[6] 76 Fed. Reg.

---

[6] This TMDL, which encompasses the 64,000-square mile watershed, is the largest ever established by the EPA. EPA, Chesapeake Bay TMDL Fact Sheet, Chesapeake Bay TMDL, https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-fact-sheet (last visited Apr. 14, 2018). In addition to Maryland, five states and the District of Columbia

549.

## 2. Maryland Law

The purpose of Maryland's stormwater management subtitle is codified in Envir. § 4-201. That section announces the General Assembly's findings:

> The General Assembly finds that the management of stormwater runoff is necessary to reduce stream channel erosion, pollution, siltation, and sedimentation, and local flooding, all of which have adverse impacts on the water and land resources of Maryland. The General Assembly intends, by enactment of this subtitle, to reduce as nearly as possible the adverse effects of stormwater runoff and to safeguard life, limb, property, and public welfare.

Envir. § 4-201.

On March 30, 2012, Maryland submitted its Phase I Watershed Implementation Plan ("WIP") to the EPA, which provided details on how it would reduce nitrogen and phosphorus from all major sources, including stormwater runoff. Dep't of Legislative Servs., Fiscal Note, H.B. 987, at 5 (2012). The development of a system of charges by local governments was necessary to fund the estimated cost of implementing the stormwater management controls needed to achieve the TMDL. *Id.* at 7-8. Accordingly, the General Assembly passed H.B. 987, amending Envir. § 4-201.1 and adding Envir. § 4-202.1, and the Governor signed the legislation into law in 2012. 2012 Md. Laws, ch.151 (H.B. 987). The new law required those jurisdictions subject to an NPDES MS4 Phase I permit—the ten largest jurisdictions in Maryland, including the City[7]—to pass legislation

---

have lands that encompass the Chesapeake Bay watershed, and these jurisdictions must work together to meet the TMDL's requirements. *Id.*

[7] Maryland's "large" jurisdictions subject to the NPDES MS4 Phase I permit

establishing a watershed protection and restoration program by July 1, 2013. *Id.* § 4-202.1(a)(1), (b). The 2012 law also required these jurisdictions to impose a Stormwater Fee and create a local watershed protection and restoration fund.[8] *Id.* § 4-202.1(c). The legislature specified how to assess a Stormwater Fee:

> (3)(i) A county or municipality shall set a stormwater remediation fee for property in an amount that is based on the share of stormwater management services related to the property and provided by the county or municipality.
> (ii) A county or municipality may set a stormwater remediation fee under this paragraph based on:
> > 1. A flat rate;
> > 2. An amount that is graduated, based on the amount of impervious surface on each property; or
> > 3. Another method of calculation selected by the county or municipality.

requirements are: (1) Anne Arundel County; (2) Baltimore County; (3) the City; (4) Montgomery County; and (5) Prince George's County. Maryland's "medium" jurisdictions include: (1) Carroll County; (2) Charles County; (3) Frederick County; (4) Harford County; and (5) Howard County. Md. Dep't of Env't, *Maryland's NPDES Municipal Separate Storm Sewer System (MS4) Permits*, http://mde.maryland.gov/programs/water/StormwaterManagementProgram/Pages/storm_gen_permit.aspx (last visited Apr. 14, 2018). Montgomery County, although considered a large jurisdiction, was excepted under the recent law because it had already established a system of charges under Envir. § 4-204. *See* Dep't of Legislative Servs., Fiscal Note, H.B. 987, at 7-8 (2012); *see also* Envir. § 4-202.1(a)(2).

[8] We note that in 2012, Envir. § 4-202.1 required the imposition of the Stormwater Fee. In 2015, however, the General Assembly passed, and the Governor signed into law, Senate Bill 863 amending Envir. § 4-202.1 to allow—but no longer require—a jurisdiction to impose a stormwater remediation fee. 2015 Md. Laws, ch.124 (S.B. 863). The fiscal note explained that pursuant to the amendment, "[r]egardless of whether a local jurisdiction decides to maintain or repeal its stormwater remediation fee under the bill[,] each jurisdiction . . . is required to annually file a financial assurance plan with MDE by July 1, 2016, and every two years thereafter on the anniversary of the date the permit was issued. The plan must identify all local actions that will be required for the jurisdiction to comply with its Phase I MS4 permit, as well as the funding sources that will support those efforts, including a five-year projection of costs and revenues for permit compliance." Dep't of Legislative Servs., Revised Fiscal Note, S.B. 863, at 2 (2015). The City had already imposed the Stormwater Fee by the time of the 2015 amendment and has not repealed it. Balt. City Code, Art. 27, § 3-1(a).

Envir. § 4-202.1(e)(3).

As we explain next, the City adopted a combination of these statutorily prescribed methods when it assessed Stormwater Fees on the non-exempt properties within its jurisdiction.

### 3. The City's Law and Regulations

The City's stormwater management infrastructure was largely installed before 1950, and with the increased visibility of environmental concerns, much of the City's focus on stormwater management has shifted to promoting projects to enhance water quality. *See* Balt. City Dep't of Pub. Works, Stormwater Management, https://publicworks.baltimorecity.gov/stormwater (last visited April 14, 2018). Yet five watersheds within City limits are still considered impaired. Balt. City Dep't of Pub. Works, Balt. City MS4 Restoration and TMDL WIP v (2015). Over 45% of the City's surfaces are impervious, meaning stormwater runoff is voluminous and its management is key.[9] *Id.* The costs of stormwater management services has increased significantly. *See* Md. Dep't of Env't, Report on Stormwater Management Act of 2007 1-2 (2008).

In 2013, following the mandate contained in Envir. § 4-202.1, the Baltimore City Council adopted Article 27, entitled "Stormwater Remediation Fees", which became effective on July 1, 2013. Baltimore City Code, Art. 27 [hereinafter "Art. 27"]. The

---

[9] Stormwater returns to bodies of water via outfalls—various points where stormwater "discharges from a conduit, stream, or drain." Water Mgmt. Admin., Md. Dep't of Env't, Maryland Stormwater Design Manual G.7 (2009). In the City, there are 1,709 outfalls alone to manage stormwater needs. Balt. City Dep't of Pub. Works, Balt. City MS4 Restoration and TMDL WIP 7 (2015).

purpose of the City's Watershed Protection and Restoration Fund ("the Fund") was "to finance the costs of improving the City stormwater management system, including its watershed protection and restoration program." *Id.* § 2-1. The Fund supports the operation of the City's stormwater management system; its permitted uses are enumerated as follows:

> Money in [the Fund] may be used for the following purposes only:
> (1) capital improvements for stormwater management, including stream and wetland restoration projects;
> (2) operation and maintenance of the City stormwater management system and facilities;
> (3) public education and outreach relating to stormwater management or stream and wetland restoration;
> (4) stormwater management planning, including:
>    (i) mapping and assessment of impervious surfaces; and
>    (ii) monitoring, inspection, and enforcement activities to carry out the purposes of the Fund;
> (5) to the extent that fees imposed under the authority of [Envir. § 4-204] are deposited into the Fund, review of stormwater management plans and permit applications for future development;
> (6) grants to nonprofit organizations for up to 100% of a project's costs for watershed restoration and rehabilitation projects relating to:
>    (i) planning, design, and construction of stormwater management practices;
>    (ii) stream and wetland restoration; and
>    (iii) public education and outreach related to stormwater management or stream and wetland restoration;
> (7) reasonable costs necessary to administer the Fund; and
> (8) any other use authorized by [Envir. § 4-202.1].

*Id.* § 2-3.

As directed under Envir. § 4-202.1(e)(1), the City imposed a Stormwater Fee on all properties located within its boundaries, subject to certain exemptions.[10] *Id.* § 3-1(a)-(b).

---

[10] Art. 27, § 3-1(b) applies the exemptions from Envir. § 4-202.1, which are for "[p]roperty owned by the State, a unit of State government, a county, a municipality, or a regularly organized volunteer fire department that is used for public purposes[.]" Envir. § 4-202.1(e)(2).

9

The City divided all non-exempt properties into two categories—single-family properties and all other properties—and it calculated fees according to the amount of impervious surface on a property.[11]  *Id.* §§ 3-2, 3-3.  For single-family properties, the City created a tiered system, defining three categories of impervious surface areas on which it would assess a Stormwater Fee at a flat rate.[12]  *Id.* § 3-2(b)(1)-(2).  For all other properties, the City assesses $15 per quarter per Equivalent Residential Unit ("ERU")—with one ERU equaling 1,050 square feet of impervious surface.[13]  *Id.* §§ 3-3(b), 3-4(a), (c).  The City also established a minimum fee of one ERU for these non-residential, non-exempt properties.  *Id.* § 3-3(d).  Qualifying religious organizations, however, were assessed at $12 per ERU *per annum* for structures owned by them so long as the property was tax-exempt

---

[11] Art. 27, § 1-1(e) defines impervious surface as "any surface that does not allow stormwater to infiltrate into the ground[,]" which "includes rooftops, driveways, sidewalks, or pavement[]" but does not include "ballasted railroad tracks."

[12]  Tier I is designated for property with impervious surface area equal to or less than 820 square feet; Tier 2, for property with impervious surface area greater than 820 square feet and less than or equal to 1,050 square feet; and Tier III, for property with impervious surface area greater than 1,050 square feet.  Art. 27 § 3-2(b)(1)-(2).  For the initial quarterly rates set under Article 27 through Fiscal Year 2017, Tier 1 properties are charged $10 per quarter (2/3 of the base rate of $15 per ERU).  Art. 27 § 3-2.  Tier 2 properties are charged the rate of one ERU, or $15 per quarter.  *Id.*  Tier 3 properties are charged twice the rate per ERU, equal to $30 per quarter.  *Id.*

[13] In 2016, the City passed Ordinance 16-523.  Most notably, this Ordinance amended Art. 27 § 3-4(c) to assess the fee, through Fiscal Year 2017, at $5 *per month* per equivalent residential unit ("ERU") instead of $15 *per quarter* per ERU for non-exempt, non-single-family properties.  Balt., Md., Ordinance 16-523 (Aug. 15, 2016).  As the City correctly notes in its brief, this change did not alter the amount charged for the Stormwater Fee, only the frequency with which it is assessed.  Another enactment that same year, Ordinance 16-581, deleted "multiple-family dwelling" from the supplemental definitions located at § 1-1(j)(2).  Balt., Md., Ordinance 16-581 (Dec. 5, 2016).

in both Maryland and the City and the structures on the property were used exclusively for worship or schooling.[14]  *Id.* § 3-3(e)(3).  Therefore, rather than being charged $60 per year per ERU, these properties are charged $12 per year per ERU.

Article 27 provides that the assessment of the base fee, based on the impervious surface area of the property, be measured "at the sole discretion of the Director of Public Works" using several methods for measurement, including geographic information systems analysis of aerial photographs, field surveys, and as-built engineering drawings. *Id.* § 3-3(c)(1).  DPW is authorized to bill the fees and may include them on water bills or on a separate bill.  *Id.* § 3-7(b).  The fees, and any applicable interest and penalties, constitute a personal debt of the property's owner and creates a lien on the property in favor of the City.  *Id.* § 3-8(a)-(b).

DPW promulgated regulations in connection with the Stormwater Fee in September 2013.  It clarified that it would use aerial photographs and Maryland's property tax database to determine the amount of ERUs on each non-exempt property and stated that the fee would appear as a line item on the quarterly water bill.  DPW Stormwater Fee Rec. Reg. (II)(c), (IV)(A)(i) [hereinafter "DPW Reg."].  The regulation defined "non-single-family property" to include property owned by religious institutions but set the fee for these institutions' qualifying properties at the reduced rate of $12 per ERU, as required by Article

---

[14] In 2015, new language was added to Envir. § 4-202.1(k) requiring a county or municipality that charges a Stormwater Fee to authorize charitable organizations that can show financial hardship to implement an alternative compliance program in lieu of paying any Stormwater Fee.  *See* 2015 Md. Laws, ch.124 (S.B. 863) (adding Envir. § 4-202.1(k)(3)(i)).  Again, this provision was not in effect when the Board's resolution in the underlying case was issued on March 23, 2015.

27. DPW Reg. (I)(i), (III)(b). To receive the reduced fee, the regulation required a religious organization to "submit an application provided by [DPW] that identifies the structures with uses considered eligible for the reduced fee. The application . . . must be renewed every 3 years." DPW Reg. (III)(b)(iii). Additionally, DPW created a system for fee credits but stated that those credits could apply only to the portions of a religious institution's property that did not receive a reduced fee. DPW Reg. (III)(b)(ii).

Any property owner aggrieved by the Stormwater Fee may seek redress before the Director of DPW within 30 days of the bill's date so long as the appeal is in writing and contains all information required by any rules and regulations adopted under Article 27. Art. 27 § 4-1(a). If unsatisfied with the result, the property owner may appeal to the Board within 30 days of DPW's decision. *Id.* § 4-1(b). After the conclusion of this administrative review, a property owner may petition for review in the circuit court and subsequently this Court, in accordance with Maryland procedural rules. *Id.* § 4-2.

## B. The Congregation's Administrative Challenges

### 1. Contest to DPW

For the third and fourth quarters of 2013, the City issued water bills to the Congregation for three properties—the main synagogue at 2001 Liberty Heights Avenue ("the Liberty Heights Synagogue"), a second synagogue at 3523 Holmes Avenue ("the Holmes Synagogue"), and a parking lot at 3515 Woodbrook Avenue ("the Parking Lot") (collectively, the "Properties"). Each bill contained a "Maryland Stormwater Fee" line item: $150.00 for the Liberty Heights Synagogue, $15.00 for the Holmes Synagogue, and $75.00 for the Parking Lot, totaling $240 for all three properties per quarter.

12

The Congregation challenged the imposition of the Stormwater Fee in a letter to the City's Bureau of Water and Wastewater dated February 27, 2014. Classifying the Stormwater Fee as a property tax, the Congregation asserted that the Properties were exempt from the Stormwater Fee because they were used for public religious worship and exempt from property taxes under Maryland Code (1985, 2012 Repl. Vol.), Tax-Property Article ("Tax-Prop."), § 7-204. The Congregation demanded that DPW void the fees and issue a full refund, contending that "the assessment is an unconstitutional burden upon the free exercise of religion [] in violation of the First Amendment of the United States Constitution and the Maryland Declaration of Rights." Alternatively, the Congregation sought a fee reduction to be applied retroactively.

On May 29, 2014, in a letter signed by the Director, DPW denied the Congregation's request to void the fees, explaining that "Baltimore City is one of ten jurisdictions mandated to implement a stormwater remediation fee by [Envir. § 4-202.1], which does not provide exemptions for tax-exempt entities." However, pursuant to Article 27 § 3-3(e)(3), the Director granted the reduction for qualifying religious organizations. He reduced the fee from $150 to $60 per quarter for the Liberty Heights Synagogue, lowering the Congregation's total quarterly bill from $240 to $150. Although the Holmes Synagogue qualified as a religious structure, the Director explained that its "fee has not been reduced as doing so would lower the fee beyond the legislated minimum charge of 1 ERU per quarter." The Director also determined that the Parking Lot did not qualify for a fee reduction because it did not contain any structures, including religious structures. Analogizing the imposition of the Stormwater Fee to a "user fee" like those for water and

13

sewage, DPW concluded that it was not unconstitutional to impose Stormwater Fees on the Congregation. DPW noted that this was a final decision appealable to the Board.

## 2. Appeal to the Board

After its largely unsuccessful challenge before DPW, the Congregation appealed to the Board on June 27, 2014. In its appeal to the Board, the Congregation did not contest DPW's assessment of applicable ERUs or the amount of impervious surface on the Properties; nor did it challenge DPW's fee reduction amounts under Article 27 § 3-3(e)(3). Instead, quoting *Eastern Diversified Properties, Inc. v. Montgomery County*, 319 Md. 45, 55 (1990), the Congregation contended that the Stormwater Fee is a property tax because it is "exacted solely for revenue purposes, is an involuntary payment of money, and the funds raised by the fee are used to . . . benefit the general public." The Congregation contested the DPW Director's characterization of the Stormwater Fee as a user fee, pointing out that "in contrast to water and sewer fees which are directly tied to services directly provided to the synagogue (as measured by how much water it actually uses), the Fund is clearly being used to benefit projects such as the general public's 'stream and wetland restoration projects' and 'public education and outreach,' which have no correlation to the properties owned by [the Congregation]." Moreover, relying on *Weaver v. Prince George's County*, 281 Md. 349 (1977), the Congregation asserted that under Article 27, the failure to pay creates a property lien, which indicates that the Stormwater Fee is a property tax, and the Properties are exempt from property taxes under Tax-Prop. § 7-204. Lastly, the Congregation contended that the Stormwater Fee posed "an unconstitutional substantial burden upon the free exercise of religion," in violation of

14

RLUIPA, the First Amendment of the United States Constitution, and the Maryland Declaration of Rights.

In its response, the City averred that the Stormwater Fee is not a property tax as it is "not based upon value or ownership of the property, but on the amount of impervious surface on the property." The City stated that this "reflect[s] the extent to which [the Congregation] contributes runoff to the system." Additionally, the City explained that Envir. § 4-202.1—the enabling statute—required local governments to impose the Stormwater Fee, which the City did in a manner similar to a user fee though it could have designed the fee as an excise or regulatory tax. The City persisted that RLUIPA was inapplicable because the Stormwater Fee was not a land use regulation within that statute's meaning; and, even if it was, the Stormwater Fee passed the "strict scrutiny" test provided in RLUIPA. The City maintained that the Stormwater Fee withstood the Congregation's First Amendment challenge because, applying the test the Supreme Court articulated in *Employment Division v. Smith*, 494 U.S. 872, 881 (1990), it is neutral and generally applicable. Lastly, the City asserted that the Stormwater Fee neither violated the Maryland Constitution nor the Maryland Declaration of Rights, claiming that neither was more protective of religious rights than the First Amendment.

In reply, the Congregation repeated its argument that the Stormwater Fee was a property tax. Even if the Board were to find that it was an excise tax, and thus the Congregation would not be exempt under Tax-Prop. § 7-204, the Congregation argued that the City lacked express legislative authority to impose such a tax. The Congregation also asserted that the Stormwater Fee violated RLUIPA because it is a land use law that limits

15

the Congregation's use of its land and is a substantial financial burden on the Congregation's free exercise of religion. Lastly, the Congregation asserted that Article 36 of the Maryland Declaration of Rights provides more protection to religious entities than the First Amendment and urged the Board to apply a "least-restrictive means" test to the law regardless of whether RLUIPA applies.

The Board held a hearing on January 27, 2015. The Congregation and the City each presented one witness. When the Board asked the Congregation about the burden that the Stormwater Fee imposed, the Congregation responded simply that it was "a small synagogue" with "a very modest budget." The Congregation did not present specific documents to support its claim of financial hardship. Ms. Kim Grove, who had been DPW's Chief of the Surface Water Management Division, testified for the City that "impervious area has been a consistent metric[]" and that DPW selected impervious area because it was "simple and objective."

The Board issued a written resolution on March 23, 2015, affirming DPW's decision and denying the Congregation's request to void the Stormwater Fees. In regard to the Congregation's first contention that the fee was a tax rather than a user fee or regulatory fee, the Board declared that it "finds that the determination requested by Appellant is beyond the authority of the Board, and accordingly the Board will not issue a decision on such determination." The Board explained that, "[s]imply stated the Board reviews and examines the law as written and as [it] appl[ies] to a certain set of facts. . . . It is not for this Board to find that a fee is a tax or a tax is a fee." Thus, the Board decided it would apply the law as written and treat the Stormwater Fee as a fee rather than a property tax and leave

16

the determination as to whether the fee is more properly categorized as a tax to "the courts of Maryland or the legislature[.]" The Board concluded that RLUIPA was inapplicable because Article 27 is not a land use regulation, observing that "Article 27 is not a landmarking law; it does not impact the development of land and does not limit or restrict the use of land."

Regarding the constitutional challenges, the Board determined that Article 27 did not violate the Free Exercise Clause of the First Amendment because the law is neutral and generally applicable. "The stormwater remediation fee is based on the amount of impervious surface area a property has regardless of the use of the property. Aside from the few property owners that are exempt from the fee[], the stormwater remediation fee applies to all property owners." The Board noted that the Supreme Court established that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 531 (1993). The Board also "found that the [Congregation's] claim that the [Stormwater Fee] was a substantial burden was undocumented and unsupported," and concluded that there was no support in case law for the proposition that the Maryland Declaration of Rights offered greater protection than the Free Exercise Clause.

### C. Judicial Review

The Congregation sought judicial review of the Board's resolution in the Circuit Court for Baltimore City. In their memoranda, the parties reiterated the same arguments made before the Board. Additionally, the Congregation argued that the Board's finding

17

that the Congregation did not submit evidence showing that the Stormwater Fee was a substantial burden resulted from the Board's failure to follow its rules of procedure, asserting that either DPW never forwarded the Congregation's water bills or the Board disregarded them. The City responded that the amount of the Congregation's Stormwater Fee was not at issue; rather, the Board rightly found that the Congregation failed to offer evidence of its own financial status to demonstrate why the amount of that bill—$600 per year—imposed a "substantial burden" on the Congregation.

After a hearing on December 15, 2015, the circuit court issued a written memorandum and order on January 6, 2016, largely agreeing with the Board's decision. Per the applicable standard of judicial review, the circuit court reviewed, with a degree of deference, the Board's factual findings for substantial evidence and then reviewed its legal conclusions *de novo*. Therefore, the circuit court reviewed the Congregation's contention regarding the categorization of the Stormwater Fee *de novo*, and determined that

> [l]ike the development impact fee in *Eastern Diversified* [, 319 Md. 45], although the Stormwater Remediation Fee is labeled a "fee" in both Section 4-202.1 and Article 27, the charge has all the indicia of a tax. The stated purpose of the charge is to raise revenue "for the implementation of local stormwater management plans," Md. Code Ann., Envir. [§ 4-202.1(d)(2)], and in order to comply with Article 27, Baltimore City property owners must not undertake any action, except for paying the fee. Moreover, the fee is mandatory of subject properties, and the funds are used to finance stormwater management plans which benefit the general public. Therefore, given the law as set out in *Eastern Diversified*, this Court finds that the Stormwater Remediation Fee is a tax, and the Board erred in finding that the Stormwater Remediation Fee is a "fee."

The circuit court then determined that the Stormwater Fee is a valid tax because the General Assembly granted the City the authority to establish the Fund pursuant to Envir. § 4-202.1

18

and the language of Article 27 is "firmly grounded" and "expressly tied to the requirements of [Envir.] Section 4-202.1[.]"  To determine whether the tax was a property tax, the court relied on the test established by *Weaver v. Prince George's County*, 281 Md. 349 (1977), and set out in *Waters Landing Limited Partnership v. Montgomery County*, 337 Md. 15, 25-26 (1994).  Applying the tests established by these cases, the court concluded that the Stormwater Fee was an excise tax, not a property tax, and therefore the Congregation was not exempt under Tax-Prop. § 7-204.  The court reasoned:

> Looking first at the legislative label that the charge is labeled a fee rather than a tax, is of little use in determining whether it is in fact a property or excise tax.  Turning next to the "actual operation and practical effect" of the tax, the Stormwater Remediation Fee is not charged based solely on ownership of the property, but rather, it is imposed only when the owner makes a particular use of the land—namely increases or decreases the amount of impervious surface.  Therefore, like the developmental impact tax in *Waters Landing*, under the second prong of the *Weaver* test, the Stormwater Remediation Fee is an excise tax.  Lastly, like the taxes in *Weaver* and *Water*[s] *Landing*, as the method to impose and fix the amount of the tax is not based on the *value of the property*, but rather the amount of the impervious surface, the Stormwater Remediation Fee is an excise tax under the third prong of the *Weaver* test.

(Italics in circuit court opinion).

The court rejected the Congregation's constitutional challenges, in large part, because Maryland applies the "neutral and generally applicable law" test to Free Exercise Clause challenges, and the Congregation did not challenge the Board's finding that Article 27 is a neutral law of general applicability.  Disposing of the Congregation's remaining claims, the court found that RLUIPA is inapplicable because Article 27 is not a land use regulation and found no merit to the Congregation's contention that the Board failed to follow its own rules of procedure in determining that the Congregation did not demonstrate

19

a substantial burden.  Lastly, the court concluded the Board's decision was supported by substantial evidence.

The Congregation timely noted an appeal on February 3, 2016.  Despite prevailing below, the City noted a cross-appeal on February 16, 2016.[15]

## DISCUSSION

## I.

## Administrative Exhaustion and Judicial Review

The parties ultimately agree on the scope of our review, albeit they arrive at this accord via two very different legal and analytical paths.  The primary issue of contention centers on the Board's decision to treat the Stormwater Fee as a fee rather than a tax based

---

[15] The City presented the following four questions in its cross-appeal:

1. "Was the lower court correct to determine whether the City's SRF created a valid excise tax when the Board had declined to consider this issue?"

2. "Was the lower court correct that the City's SRF is consistent with the State enabling legislation?"

3. "Was the lower court correct that the Congregation was not exempt from payment of the City's SRF under § 7-204 of the Tax Property Article?"

4. "Did the Board correctly determine that the City's SRF does not violate the Congregation's rights under RLUIPA, the First Amendment of the U.S. Constitution, and Article 36 of the Maryland Declaration of Rights?"

The City conceded at oral argument before this Court that, as the prevailing party before the circuit court, it did not have a right to file a cross-appeal.  *See Paolino v. McCormick & Co.*, 314 Md. 575, 579 (1989) (citation omitted) ("[A]n appeal or cross appeal is impermissible from a judgment wholly in a party's favor.").  We include the City's counterarguments in this opinion to the extent that they respond to the Congregation's contentions.  We must, however, strike the City's reply brief.

on the labels employed in Envir. § 4-202.1 and Article 27. The Board opined that it was beyond its "authority to decide that a law as written is not properly categorized[,]" but then on petition for judicial review, the circuit court considered the issue *de novo* and determined that the Stormwater Fee was, in fact, a tax. Before this Court the Congregation maintains—as it did before DPW, the Board, and the circuit court—that the City "contravened its authority under [Envir. §] 4-202.1" in Article 27 because the assessment constituted an invalid tax instead of a statutorily authorized fee.

In its response brief to this Court, the City acknowledges, citing *O'Donnell v. Bassler*, 289 Md. 501, 509-511 (1981), that under the doctrine of administrative exhaustion, "[w]here an administrative agency has not fully performed its function, a reviewing court shall not substitute its judgment for the expertise of the administrative agency. . . . Instead, a court's proper response is to remand the case back to the Board for further review." The City submits, however, that the circuit court's decision declaring the fee an excise tax in this case was proper under the constitutional exception to exhaustion because the Congregation "attacks the very power of the legislature to enact an ordinance on a particular matter." The City proposes that we should review the *circuit court's* decision rather than that of the Board on the question of whether the Stormwater Fee exceeds the authority granted to the City under Envir. § 4-202.1.

The Congregation, for its part, sees nothing unusual about the procedural posture of this case and contends that the Board *did* decide the issue by treating the Stormwater Fee as a fee, rather than dismissing that portion of the Congregation's appeal or refusing to move past the issue after opining on the limited scope of its authority. The Congregation

21

maintains that the Board's decision was final and is properly before this Court because "there is no further administrative function left for the [Board] to perform." In the end, although both parties disagree over whether it is the Board's decision or the circuit court's decision that is before us, both agree that we should review the issue *de novo*.

When considering an appeal from judicial review of a final administrative decision, we review the agency's decisions, not that of the circuit court. *People's Counsel for Balt. Cty. v. Surina*, 400 Md. 662, 681 (2007). As to factual findings, we are limited to considering "whether the agency decision is supported by substantial evidence in the record." *Anderson v. Gen. Cas. Ins. Co.*, 402 Md. 236, 244 (2007) (citation omitted). For conclusions of law, we afford deference to an agency's interpretation of the statutes it administers, *id.* at 244-45, but "we owe no deference to an agency's erroneous conclusions of law." *Manekin Constr., Inc. v. Md. Dep't of Gen. Servs.*, 233 Md. App. 156, 172 (2017). Therefore, we review questions of law *de novo*. *Id.* (citing *Assateague Coastkeeper v. Md. Dep't of Env't*, 200 Md. App. 665, 690 (2011)).

As we stated in *Priester v. Baltimore County*,

> [w]hen a legislature provides an administrative remedy as the exclusive or primary means by which an aggrieved party may challenge a government action, the doctrine of administrative exhaustion requires the aggrieved party to exhaust the prescribed process of administrative remedies before seeking "any other" remedy or "invok[ing] the ordinary jurisdiction of the courts."

232 Md. App. 178, 193, *cert. denied*, 454 Md. 670 (2017) (emphasis omitted) (quoting *Soley v. State Comm'n on Human Relations*, 277 Md. 521, 526 (1976) (emphasis omitted)). "The rule of finality overlaps the rule of exhaustion." *Id.* Before obtaining judicial review,

22

"a party must exhaust the administrative remedy and obtain a final administrative decision[.]" *Laurel Racing Ass'n, Inc. v. Video Lottery Facility Location Comm'n*, 409 Md. 445, 460 (2009). Exhaustion requires that an individual "invoke and pursue the administrative process until he or she receives a final decision from the agency at the utmost level of the administrative hierarchy." *Priester*, 232 Md. App. at 194. Except in rare circumstances, exhaustion also prevents a court from "pass[ing] upon issues *presented to it for the first time* on judicial review[.]" *Halici v. City of Gaithersburg*, 180 Md. App. 238, 248 (2008) (emphasis added) (internal quotations omitted). Therefore, a party's failure to raise a contention during the administrative process constitutes a failure to satisfy administrative exhaustion and is "an improper request for 'the courts to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency.'" *Id.* at 249 (quoting *Chesley v. City of Annapolis*, 176 Md. App. 413, 427 n.7 (2007)) (additional citation omitted). Finality, on the other hand, occurs in the administrative sense when "the order or decision [disposes] of the case by deciding all question[s] of law and fact and leave[s] nothing further for the administrative body to decide." *Willis v. Montgomery Cty.*, 415 Md. 523, 535 (2010) (citations omitted).

We conclude that the Congregation exhausted its administrative remedies and obtained a final administrative decision on the issue of whether the Stormwater Fee constitutes a tax or fee. The issue is therefore properly before us, and there is no need to consider whether the constitutional exception to the exhaustion requirement applies.

Article 27 of the City Code specifically provided the administrative review process: first, the party must seek review before DPW regarding the assessed fees and if

23

unsuccessful, it can then appeal DPW's decision to the Board. Art. 27, § 4-1. Upon a final decision by the Board, a still-aggrieved party can seek judicial review in the Circuit Court for Baltimore City and may then subsequently obtain review before this Court. *Id.* § 4-2. Clearly, Article 27 contemplated the Board's determination as the "final decision from the agency at the utmost level of the administrative hierarchy." *See Priester*, 232 Md. App. at 194.

Here, it is undisputed that the Congregation raised the question of the Stormwater Fee's classification from the outset and received a final decision at each step of the administrative process. Beginning with its letter to DPW dated February 27, 2014, the Congregation iterated that, as a religious organization, it was exempt from property taxes and that imposition of the Stormwater Fee violated this exemption. DPW refused to void the assessed fees on May 29, 2014, indicating that it was a "final decision . . . denying the appeal." The following month, the Congregation appealed to the Board and again detailed its assertion that the Stormwater Fee was an improper property tax—and not an authorized fee. The Board applied a plain reading of the statute and declined to treat the Stormwater Fee as anything other than a fee, stating that it was without the power to do so. This decision was a final determination because, following its issuance, the Board had "nothing further . . . to decide."[16] *See Willis*, 415 Md. at 535. Thus, only after presenting the issue

---

[16] The City argues, however, that because administrative agencies may consider the validity of a governing statute in some instances, *see, e.g.*, *Holiday Point Marina Partners v. Anne Arundel Cty.*, 349 Md. 190, 199-200 (holding that administrative zoning agency could consider validity of zoning ordinance), the issue of whether the Stormwater Fee was a tax was one within the Board's area of expertise and the courts should not decide the issue in the first instance. *Cf. O'Donnell v. Bassler*, 289 Md. 501, 512-13 (1981) (holding

24

throughout the administrative process and exhausting those avenues did the Congregation seek to petition for judicial review.

We hold the Congregation properly preserved its categorization contention for judicial review and we discern no "improper request" for the circuit court "to resolve the matter[] *ab initio*[.]" *Halici*, 180 Md. App. at 249 (internal quotations and citation omitted). As the issue posed a question of law, the circuit court correctly reviewed it *de novo* and we now apply that same standard of review to the Board's decision. *See Manekin Constr., Inc.*, 233 Md. App. at 172.

## II.

## Statutory Construction

## A. City did not Exceed its Authority by Adopting Article 27

The Congregation contends that Article 27 exceeds the authority granted to the City by Envir. § 4-202.1. Relying on *Eastern Diversified*, 319 Md. at 49, the Congregation underscores that local governments do not have power to tax on their own authority, but may do so only if and when the State grants them power, adding that courts strictly construe

---

that the circuit court improperly substituted its judgment for the expertise of the administrative agency when the court applied a zoning regulation that was not in place at the time of the administrative hearing and modified certain conditions the agency had imposed on an airfield based on the prior zoning regulation). We note that pursuant to the Charter, Article VII, § 86, the Board's grant of authority is to "examine, review and revise acts or rulings . . . affecting the construction, alteration, use of operation of land or buildings in the City[.]" That is what the Board did here. Its decision to treat the Stormwater Fee as a fee did not render the issue interlocutory or offend the doctrine of administrative exhaustion.

the delegation of such taxing power.[17]

To evince the scope of the City's authority, the Congregation contrasts Envir. § 4-202.1's use of the term "fee" with Envir. § 4-204(d)(1), which allows a county or municipality to adopt a "system of charges" to fund the creation of stormwater management programs. The thrust of the Congregation's assertion here is that the Stormwater Fee is not based on each property's share of stormwater management services, as required by Envir. § 4-202.1(e)(3)(i), given that (1) the ERU is inflated because certain properties are exempt; (2) it affords blanket rates for single-family properties; and (3) it is based on a property's impervious surface area and not the "pollutant quality of any runoff[.]"

The City responds that Article 27, in line with Envir. § 4-202.1, was enacted to ensure compliance with regulations pursuant to MS4 permits and also provided for raising revenue to ensure such compliance. It notes that although the circuit court found Article 27 was a tax as it "has all the indicia of a tax," Article 27 comports with Envir. § 4-202.1, the purpose of which "is to provide financial assistance" to implement the plans. Envir. §

---

[17] We observe that the Congregation's reliance on *Eastern Diversified* for this point is somewhat misplaced because the express powers granted by the legislature to Montgomery County (and all other charter counties) are different from those granted to Baltimore City. *Compare* Express Powers Act, codified at Maryland Code (2013), Local Government Article ("LG"), § 10-201 *et seq.* and 10-301 *et seq. with* Balt. City Charter, Art. (II). Section 40 of Article II sets out the City's omnibus taxing authority:

> To have and exercise, within the limits of Baltimore City, in addition to any and all taxing powers heretofore granted by the General Assembly of Maryland to the Mayor and City Council of Baltimore, the power to tax to the same extent as the State of Maryland has or could exercise said power within the limits of Baltimore City as a part of its general taxing power; and to provide by ordinance for the imposition, assessment, levy and collection of any tax or taxes authorized by this subsection; . . . .

26

4-202.1(d)(2). Thus, the City argues, the contrast between the language in Envir. § 4-204(d) and § 4-202.1 is inapposite because the purpose of Envir. § 4-202.1 allows for a tax or fee. Additionally, the City contends that Article 27 complied with Envir. § 4-202.1(e)(3)(ii), which provides guidance on how a jurisdiction can set a fee, including a flat rate, a graduated amount based on impervious surface, or *any other method*. The City acknowledges that the Stormwater Fees may be higher to account for exempted properties, however, it maintains that Envir. § 4-202.1 provides for these exemptions.

When deciding a question of statutory construction, "[t]he cardinal rule . . . is to ascertain and carry out the intention of the Legislature." *Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444 (1997) (citation omitted). The first step is to analyze the words of the statute, affording them their ordinary meaning. *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 294 (2017). We presume that the legislature "meant what it said and said what it meant[,]" so when statutory language is clear, we need not look past the statute. *Id.* (quotation marks and citation omitted). If it is ambiguous, we employ additional statutory interpretation tools such as "the meaning of words in light of the statute as a whole and within the context of the objectives and purposes of the enactment." *Marriott Emps.*, 346 Md. at 445. In resolving statutory ambiguity, we do not give effect to constructions that are "illogical, unreasonable, or inconsistent with common sense." *Cleanwater Linganore, Inc.*, 456 Md. at 295 (quotation marks and citation omitted).

We utilize the same principles to interpret local enactments as we do for state statutes. *F.D.R. Srour P'ship v. Montgomery Cty.*, 179 Md. App. 109, 122-23 (2008)

27

(citations omitted). Further, units of the State can enforce state power only when the State has specifically delegated that authority. *E. Diversified*, 319 Md. at 49. Taxing is one of these delegable state powers. *Id.*

Analyzing the plain language of Envir. § 4-202.1, we hold that the City Council did not exceed its authority when it enacted Article 27. Here, Envir. § 4-202.1(c) required the creation of a watershed protection and restoration program, which would include a stormwater remediation fee and a local fund. Envir. § 4-202.1(d)(2) states the purpose behind the fund is "to provide financial assistance for the implementation of local stormwater management plans[.]" Envir. § 4-202.1(e)(1) requires the establishment and collection of such a fee from all property owners not exempt under subsections (e)(2) or (f). Meanwhile, Envir. § 4-202.1(e)(3) establishes the calculation of the fee:

> (i) A county or municipality shall set a stormwater remediation fee for property in an amount that is *based on the share of stormwater management services related to the property* and provided by the county or municipality.
> (ii) A county or municipality may set a stormwater remediation fee under this paragraph based on:
> > 1. A flat rate;
> > 2. An amount that is graduated, based on the amount of impervious surface on each property; or
> > 3. Another method of calculation selected by the county or municipality.

(Emphasis added).

The City then enacted Article 27, which established a system for assessing this charge. We also conclude Article 27 is in line with the stated purpose of Envir. § 4-202.1, found in subsection (d)(2), which is "to provide financial assistance for the implementation of local stormwater management plans[.]"

We note that Envir. § 4-202.1(e)(3)(i)—requiring that the assessed fee be "based on

28

the share of stormwater management services related to the property[]"—is not clear because that specific provision does not clarify what "related to the property" means. Fortunately, however, the subsequent provision, Envir. § 4-202.1(e)(3)(ii), provides three options, including one open-ended method for assessing the necessary fee. As explained above, the City delineated a three-category system for single-family properties, each with a specified flat rate. *Id.* § 3-2(b)(1)-(2). For all other properties, the City established a rate of $15 per ERU and a mandatory minimum assessment of one ERU per property. *Id.* §§ 3-3(b), (d), 3-4(c). It also afforded a reduced rate to qualifying religious organizations, assessing $12 per ERU per annum for any structures on property used exclusively for worship or education. *Id.* § 3-3(e)(3). Thus, the City opted to apply a flat rate to single-family properties while charging other non-exempt properties based on the property's total impervious surface. Nothing in the statute forbids the local jurisdiction from categorizing different properties and applying different methods for fee assessments based on those categorizations.

Additionally, the Congregation's argument that exempt properties inflate the rates of other properties is inapposite to the contention that the City lacked authority to enact Article 27 (although, as we discuss further below, the argument bolsters the view that the fee is not a property tax). Article 27 provides that it "does not apply to any property that is expressly exempted by the Enabling Law." Art. 27, § 3-1(b). Thus, even if the fees for every non-exempt property—including the Congregation's Properties—may be inflated as a result, the General Assembly specifically authorized those exemptions, and we assume the legislature knew and understood the effect of its decision. Reaching the opposite

29

conclusion would be neither logical nor reasonable. *See Marriott Emps.*, 346 Md. at 445.

The General Assembly clearly delegated authority to raise funds to establish a local stormwater management fund. This purpose is delineated in Envir. § 4-202.1. The language of that enactment provides certain requirements that the local authority must follow, such as requiring that the amount be related to the property and exempting certain properties; and is permissive in other areas, such as the methods used to calculate the charges. We hold the City acted within its authorization to raise funds for this purpose and used its discretion for matters within its purview. The City did not exceed its power in enacting Article 27.

## B. Categorization of the Stormwater Fee

In support of its contention that the Stormwater Fee is an improper tax and not a user fee, the Congregation points out that the assessments were calculated based on an inflated rate to account for the exempted properties. Again relying on *Eastern Diversified*, the Congregation insists that there is no adequate nexus between the Stormwater Fee and the benefit to the Properties and, thus, it cannot be a fee. The Congregation avers that the Stormwater Fee is a tax because its purpose is to raise revenue for improving the City's stormwater management and the Congregation has no obligation apart from payment. The Congregation also claims that the Stormwater Fee is a property tax—and not an excise tax—because it is assessed based on property valuation (i.e., the amount of impervious surface) and the failure to pay results in a property lien. As a religious organization, the Congregation maintains that the Properties are exempt from property tax under Tax-Prop. § 7-204.

The City agrees with the characterization of the Stormwater Fee as a measure for the primary purpose of raising revenue for the Fund. It acknowledges that the legislative history demonstrates the intent to help provide funding for local jurisdictions to comply with the CWA's mandates. Comparing the "system of charges" language in Envir. § 4-204(d) to the language allowing for a "fee" in Envir. § 4-202.1, the City refers to an Attorney General opinion concluding that Envir. § 4-204(d)'s language expanded from "fee system" to "system of charges" to clarify the ability to impose a fee or a tax. *See* 91 Md. Atty. Gen. Op. 152 (2006). The City further avers that when the General Assembly amended Envir. § 4-202.1, it required that Envir. § 4-204(d)'s charges be imposed in a manner consistent with those utilized in Envir. § 4-202.1.

The City contends that if the fee is properly categorized as a tax, then it is an excise tax, not a property tax, because it relates to the privilege of using the property and not simply the property's valuation. The City points out that the Stormwater Fee is a charge calculated based on a property's amount of impervious surface and that failure to pay other charges that are not property taxes, like water bills, can result in a property lien.

**i. Tax or Fee**

We must first determine whether the Stormwater Fee is a regulatory or user fee or a tax. Over 150 years ago, the Court of Appeals defined "taxes" as "burdens, charges or impositions, put or set upon persons or property for public uses[.]" *Mayor & City Council of Balt. v. Greenmount Cemetery*, 7 Md. 517, 535 (1855); *see also Workmen's Comp. Comm'n v. Prop. & Cas. Ins. Guar. Corp.*, 319 Md. 1, 5 (1990) (quoting *Greenmount Cemetery*). More recently, the Court of Appeals in *Eastern Diversified* iterated the

Supreme Court's definition of "tax" as the "enforced contribution to provide for the support of [the] government." *E. Diversified*, 319 Md. at 54 (quoting *U.S. v. LaFranca*, 282 U.S. 568, 572 (1931)) (additional citations omitted). A regulatory fee, on the other hand, is different in that it is levied for the purpose of regulation, mandating compliance with delineated conditions, and requires payment of a specified sum. *See Md. Theatrical Corp. v. Brennan*, 180 Md. 377, 381 (1942). With a fee, there is seemingly at least some level of "choice as to the payment or non-payment of the charge." *See E. Diversified*, 319 Md. at 54 (discussing *United States v. Maryland*, 471 F. Supp. 1030, 1036 (D. Md. 1979), and how that court decided a surcharge was a tax, in part, because there was no choice whether to pay).

As the Court of Appeals stated, "The question whether a particular act is primarily a revenue measure[] or a regulatory measure is important[] because different rules of construction apply." *Brennan*, 180 Md. at 381. The Court clarified that the two types of taxes and fees may have overlapping characteristics but that the focus is on the underlying purpose of the enactment:

> A regulatory measure may produce revenue, but in such a case the amount must be reasonable and have some definite relation to the purpose of the act. A revenue measure, on the other hand, may also provide for regulation, but if the raising of revenue is the primary purpose, the amount of the tax is not reviewable by the courts.

*Id.*

This Court recently considered the distinction between fees and taxes in *Accokeek, Mattawoman, Piscataway Creeks Cmtys. Council, Inc. v. Md. Pub. Serv. Comm'n.*, 227 Md. App. 265 (2016), *aff'd*, 451 Md. 1 (2016). The issue in that case involved the

Maryland Public Service Commission's requirement that an applicant for a certificate of public convenience and necessity for the construction of an electric generating station contribute $40 million to Strategic Energy Investment Fund ("SEIF") and $8 million to Maryland Energy Assistance Program ("MEAP"). *Id*. at 294-95. The appellant claimed the charges were actually imposed as a tax and challenged the Commission's power to impose taxes absent explicit authorization from the legislature. *Id*. The Commission agreed that it lacked the power to levy taxes; however, it insisted that the payments to MEAP and SEIF were not taxes but merely conditions that the Commission may impose. *Id*.

We explained that despite its label and although "directed to specialized funds rather than a general treasury," a charge could nevertheless constitute a tax. *Id.* at 298 (citing *E. Diversified*, 319 Md. at 52-55); *see also Prop. & Cas. Ins. Guar. Corp.*, 319 Md. at 5-8 ("assessments" based on percentages of workers' compensation awards and settlements and contributed to Subsequent Injury Fund and Uninsured Employers Fund); *Brennan*, 180 Md. at 380–82, ("license or permit fee" on public dances in Baltimore City collected for benefit of special fund of board of police commissioners). We ultimately held, however, that payment of contributions constituted a fee because the attachment of conditions "was to calibrate the final outcome" to address statutory prescriptions and "mitigate the identified consequences of the particular project[.]" *Id.* at 305. As a result, even though the measure raised revenue, "the overall character . . . [was] not indicative of a tax." *Id.* (footnote omitted). More specifically, Judge Arthur, writing for this Court, concluded that "[n]othing indicates that the Commission considered the financial needs of government

33

programs that would be funded by the contributions. Instead, the process by which the Commission determined the payment amounts and recipients was limited to fact-finding specific to the generating station, in relation to the standards expressed in the statute." *Id.* at 305.

Our analysis, as in *Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc.*, is aided by *Eastern Diversified*, in which the Court of Appeals examined whether a "development impact fee" for road construction imposed under the Montgomery County Code was a valid regulatory fee or an unauthorized tax. 319 Md. at 46. The hearing examiner below had decided the impact fee was not a tax because, *inter alia*, the fee was "not compulsory, like a tax, but [was] assessed only when a building permit [was] sought and then only for the sole purpose of making local road improvements" that would ultimately benefit the property for which the permit was sought. *Id.* at 47.

The Court of Appeals instructed that "[i]n evaluating whether a development fee is a regulatory charge or a tax, 'the purpose of the enactment governs rather than the legislative label.'" *Id.* at 53 (quoting *Campbell v. City of Annapolis*, 289 Md. 300, 305 (1981)). For the enactment to be regulatory in effect, there must be a relationship between the fee and the benefit to the property owner, and the fee "must be reasonable and have some definite relation to the purpose of the [enactment]." *Id.* at 55 (quotation omitted). The Court quoted approvingly from *Brennan*, that "'[t]here is no set rule by which it can be determined in which category a particular Act primarily belongs. In general, it may be said that when it appears from the Act itself that revenue is its main objective, and the amount of the tax supports that theory, the enactment is a revenue measure.'" *Id.* at 53

34

(quoting *Brennan*, 180 Md. at 381). In ruling that the development impact fee was actually

a tax, the Court reasoned that it "[1] is exacted solely for revenue purposes, [2] is an

involuntary payment of money, and [3] the funds raised by the fee are used to finance road

construction which benefit the general public." *Id.* at 55. The Court did not specify what

type of tax it was, ruling simply that Montgomery County had no authority to impose any

tax. *Id.* at 55 n.4.

Although Envir. § 4-202.1 and Article 27 refer to the stormwater assessment as a

fee, as delineated in *Brennan*, we look to the purpose of the enactment. *See* 180 Md. at

381. According to Envir. § 4-202.1(d)(2), the objective of establishing a local fund "is to

provide financial assistance for the implementation of local stormwater management

plans[.]" Envir. § 4-202.1(d)(2). Similarly, Article 27 notes that the Fund is created

pursuant to authority under Envir. § 4-202.1 with a purpose of "financ[ing] the costs of

improving the City stormwater management system, including its watershed protection and

restoration program." Art. 27, § 2-1. From these stated purposes, it is clear that the

objective of the Stormwater Fee "is to raise revenue."[18] *See E. Diversified*, 319 Md. at 55;

*see also Montgomery Cty. v. Md. Soft Drink Ass'n, Inc.*, 281 Md. 116, 135 (1977) (ruling

_____

[18] Although the General Assembly's 2015 amendment occurred after the onset of this litigation, it strengthens our conclusion. In addition to allowing for, but no longer requiring the imposition of a Stormwater Fee, Senate Bill 863 amended Envir. § 4-202.1(e) to permit a county to fund the stormwater management costs by using general revenues or issuing bonds, including allowing a county to adjust its property tax rate to offset the charged Stormwater Fee. *See* 2015 Md. Laws, ch.124 (S.B. 863). "The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature." *Kushell v. Dep't of Nat. Resources*, 385 Md. 563, 576 (2005) (citation omitted). We conclude that this amendment clearly indicates that the General Assembly intended the Stormwater Fee to be treated as a tax.

that legislation allowing for a tax on non-returnable beverage containers had the "dominant thrust" of raising revenue). Article 27 delineates the permitted uses of the revenue collected, including among others, "operation and maintenance of the City stormwater management system and facilities;" "public education and outreach[;]" and "grants to nonprofit organizations[.]" Art. 27, § 2-3. The enumerated uses of the Fund are indisputably utilized for the benefit of the general public. *See Prop. & Cas. Ins. Guar. Corp.*, 319 Md. at 6 (ruling that workers' compensation laws imposing fees on employers were taxes and imposed for the public good because one law encouraged the hiring of handicapped persons while the other ensured that injured workers received compensation). Although the money raised via the Stormwater Fee goes to "specialized funds" and not into the "general treasury," that does not prevent its categorization as a tax. *See Accokeek, Mattawoman, Piscataway Creeks Cmtys. Council, Inc.*, 227 Md. App. at 298.

Furthermore, like the developers in *Eastern Diversified*, there is no additional obligation imposed under Article 27 on owners of non-exempt properties apart from the requirement to pay the Stormwater Fee. *See E. Diversified*, 319 Md. at 55. The Court of Appeals has instructed that a lack of any additional obligations on the part of a non-exempt property owner is a strong indicator that the subject fee is indeed a tax. *See E. Diversified*, 319 Md. at 54 (quoting *LaFranca*, 282 U.S. at 572); *Brennan*, 180 Md. at 381.

We also observe that the Stormwater Fee does not qualify as a user fee or service charge because it is not based on a commodity or service consumed. *See West Capital Assocs. Ltd. P'ship v. City of Annapolis*, 110 Md. App. 443, 450 (1996). Even though the City included the fee on water bills, the Stormwater Fee is not akin to a user fee, such as

36

for water or sewer service.  Rather, the Stormwater Fee is a charge that is applied, among other things, toward the operation and maintenance of the City stormwater management system and facilities.  *See also United States v. Maryland*, 471 F. Supp. at 1033, 1036 (holding that a Maryland law, which imposed a surcharge on electrical companies and allowed the companies to add the surcharge to customers' bills, was a tax).

In conclusion, we discern no definite relation between Article 27's purpose and the assessment of the Stormwater Fee that allows us to determine that it is a regulatory fee or user fee.  Therefore, despite its label and any nominal effect it has on regulation, we conclude that the Stormwater Fee is a tax.

### ii. Excise Tax or Property Tax

We turn to address the issue of whether the Stormwater Fee is properly categorized as an excise tax or a property tax.  The seminal case for this determination is *Weaver v. Prince George's County*, 281 Md. 349 (1977).  In that case, the Court of Appeals examined whether the Prince George's County Multifamily Occupancy Tax, a legislatively authorized tax on the rent paid by the lessees of multifamily residential units, was a property tax or an excise tax.  *Id.* at 352, 355.  The Court explained that "a property tax is a charge on the owner of property by reason of his [or her] ownership alone without regard to any use that might be made of it," whereas a modern definition of excise tax has included "every form of taxation that is not a burden directly imposed on persons or property."  *Id.* at 357-58.  The Court also described an additional method to differentiate property and excise taxes:

[T]he property tax and the excise tax may be differentiated by the methods

37

used to impose them and to fix their amount. Thus, it has been held that where a tax is levied directly by the Legislature without assessment and is measured by the extent to which a privilege is exercised by a taxpayer without regard to the nature or value of his assets, it is an excise. Where, however, the tax is computed upon a valuation of the property and is assessed by assessors, and where the failure to pay the tax results in a lien against the property, it is a property tax, even though a privilege might be included in the valuation.

*Id.* at 358 (citations omitted).

The Court reiterated that "[t]he line that separates an excise tax from a property tax is a difficult one to draw[;]" however, to do so in *Weaver*, the Court considered "the designation placed upon the tax by the Legislature, the subject matter of the tax, and the incidents of the tax, i.e., the manner in which it is assessed and the measure of the tax." *Id.* at 356 (citation omitted). The Court began by noting that the state enabling act and the ensuing county ordinance regarded the charge as an occupancy tax. *Id.* at 356. Additionally, "the tax appear[ed] to be a levy on the use and occupancy of a dwelling rather than an assessment directly against any property interest in the tenant's hands." *Id.* at 357. Finally, with regard to how the county levied the tax, the Court explained that although the tax was on the use of the property—one of the incidents in the bundle of property-ownership rights—the tax applied only during periods when the tenant occupied the premises and was thus based on the extent the taxpayer exercised a privilege. *Id.* at 358-59. Based on this, the Court concluded that the occupancy tax was, "in name and effect, a valid excise on the privilege of occupying a residential rental dwelling unit, since the tax falls on only one of the manifold attributes associated with ownership of a leasehold interest in property." *Id.* at 359.

In *Waters Landing Limited Partnership v. Montgomery County*, the Court of Appeals applied—and clarified—the *Weaver* test. 337 Md. 15, 25-27 (1992). A month after the ruling in *Eastern Diversified*, Montgomery County passed emergency legislation "reenact[ing] the development impact fee as a development impact tax" to apply retroactively and stating it was pursuant to its taxing authority granted by the State. 337 Md. at 21-22. The Court of Appeals ruled that the county had authority to impose the tax under its general taxing authority and that the tax could be applied retroactively. *Id.* at 24-25, 31-32.

The Court expounded that in determining that the impact tax was an excise tax rather than a property tax, unlike those situations in which the Court must distinguish between a tax and a fee, the label the legislature gives to a particular type of tax is "entitled to 'considerable weight[,]'" and noted that Montgomery County considered the tax to be an excise tax. *Id.* at 25 (quoting *Weaver*, 281 Md. at 356). Looking to the operation and effect of the tax, the Court reasoned that the tax was not assessed solely because of property ownership; instead, the tax applied only when the owner sought to develop the land—that is, make a particular use of it. *Id.* at 25-26. Finally, the Court considered the methods used to impose the tax, determining that it "was levied . . . on all who seek to develop land within the designated districts." *Id.* at 26-27. The Court also surmised the tax was not a property tax because "[u]nlike a property tax, which ordinarily results in a lien on only the property taxed, this lien is imposed on all the taxpayer's property." *Id.* at 27. *See also Ogrinz v. James*, 309 Md. 381, 389, 397 (1987) ("Although nonpayment of the tax may result in a lien on [real and personal] property, so too does the failure to pay income, sales, and use

39

taxes.").

Utilizing the *Weaver* test, and appending the insights gleaned from *Waters Landing*, we hold that the Stormwater Fee is an excise tax. The first prong does not aid our conclusion, given that the City—like the General Assembly—labeled the charge a fee. *See* Envir. § 4-202.1(e); Art. 27, §§ 3-1–3-8. Our consideration of the operation and effect of the Stormwater Fee, however, foretells much about its categorization as an excise tax. The General Assembly determined that the proportion of impervious surface area of a property is a proxy for usage of stormwater system services. The charge is based on an aspect of the use of the property—the amount of impervious surface. It is not based on the value of the property or ownership of the property. Thus, the Stormwater Fee "is not imposed simply because the taxpayer owns the land; rather it is imposed only when the owner of land makes a particular use of the land, i.e., develops it." *Waters Landing*, 337 Md. at 26.

The third and final prong of the *Weaver* test—methods used to calculate the assessment—likewise supports our conclusion that the Stormwater Fee is an excise tax. Here, the City levied the Stormwater Fee according to the amount of impervious surface on the property. The Stormwater Fee amount has no relation to the value of the land, as a property tax would. Instead, it is based on the extent to which a property owner maintains impervious surfaces on the land. For non-exempt, non-single-family properties, the amount assessed is specifically tethered to the measurement of a property's impervious surface, calculated pursuant to a standardized metric—the ERU—multiplied by the specific property's particularized use. To bolster our determination on this prong, we note that most property owners can undertake various efforts to reduce their assessment via the

credit system. *See* DPW Reg. (III)(b)(ii). Further, Article 27 provides for hardship exemptions for those who qualify. Finally, we observe that although the City may use property tax records to measure the amount of impervious surface and failure to pay results in a personal lien on the property, these features alone do not alter the Stormwater Fee's intrinsic operative characteristics as an excise tax.

## C. Article 36 of Maryland Declaration of Rights

On appeal, the Congregation abandons its argument that Article 27 violates the First Amendment of the United States Constitution. Rather than contend Article 27 is unconstitutional because it is not neutral and generally applicable—the standard that governs free-exercise claims under the First Amendment—the Congregation asks us to apply, for the first time, a more rigorous standard for free-exercise cases brought under Article 36 of the Maryland Declaration of Rights. The Congregation offers that, because Maryland courts have not held the First Amendment's Free Exercise Clause to be *in pari materia* with Article 36 of the Declaration of Rights, this Court may adopt a new standard.[19] The Congregation suggests that we adopt the "least-restrictive means" test that applies to the Religious Freedom Restoration Act ("RFRA"). *See Burwell v. Hobby Lobby*, 134 S. Ct. 2751 (2014). Under this test, the Congregation urges us to conclude that the Stormwater Fee is a substantial burden on religious exercise because it "imposes additional financial burdens . . . based on additional monetary assessments of [the Congregation's] religious

_____

[19] The phrase *in pari materia*, according to some, "obscures more than it illuminates." *See* Richard C. Boldt & Dan Friedman, *Constitutional Incorporation: A Consideration of the Judicial Function in State and Federal Constitutional Interpretation*, 76 Md. L. Rev. 309, 344 n.193 (2017).

structures" and that two of the Properties are "subject to additional expense" because the City improperly structured the religious credit, which did not allow the Holmes Synagogue and the Parking Lot to qualify for a reduction.

The City counters that RFRA is wholly inapplicable because the Congregation does not challenge Article 27 under the First Amendment of the U.S. Constitution in this appeal and because the Supreme Court previously ruled in *City of Boerne v. Flores*, 521 U.S. 507 (1997), and reiterated in *Hobby Lobby* that RFRA does not apply to state and local governments. It further notes that *Hobby Lobby*, which applied RFRA, had extraordinary facts, including potential fines in the millions of dollars, which are absent here. The City maintains that Article 27 is a neutral law with general applicability—the test applicable to Article 36 claims as previously articulated by the Court of Appeals—and notes that the Congregation's assessment was reduced due to the religious credit. Therefore, the City contends, the Board correctly determined that the Congregation's rights under Article 36 were not violated.

The First Amendment forbids Congress from enacting any "law respecting an establishment of religion, or prohibiting the free exercise thereof[,]" U.S. Const. amend. I, and this prohibition extends to the states via the Fourteenth Amendment. *Archdiocese of Wash. v. Moersen*, 399 Md. 637, 640 (2007). Maryland, through Article 36, also guarantees the free exercise of religion as it provides in part that "all persons are equally entitled to their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice[.]" Md. Dec. of Rights, art. 36.

42

As the Congregation concedes, there is no authority for applying the standard for RFRA claims to actions brought under Article 36. On at least two occasions, the Court of Appeals has announced that the Free Exercise Clause in Article 36 of the Declaration of rights, like that of the First Amendment, "does not provide 'a constitutional right to ignore neutral laws of general applicability,' even when such laws have, as an incidental effect, the burdening of a particular religious activity[.]" *Moersen*, 399 Md. at 640-41 (quoting *Flores*, 521 U.S. at 513); *see also Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 585 (2001) (same). Thus, the Court of Appeals has made clear that Article 36 of the Declaration of Rights does not permit the Congregation to avoid a neutral and generally applicable law. This Court is "bound by the Court of Appeals precedent." *Montgomery Cty. Career Fire Fighters Ass'n v. Montgomery Cty.*, 210 Md. App. 200, 230 (2013); *see also Scarborough v. Altstatt*, 228 Md. App. 560, 577-78 (2016), *cert. denied*, 450 Md. 129 (2016) ("[T]he ruling of the Court of Appeals remains the law of this State until and '[u]nless those decisions are either explained away or overruled by the Court of Appeals itself.'" (citation omitted)). Accordingly, we may not entertain the Congregation's invitation to adopt and apply a new standard of law in contravention of existing Court of Appeals' precedent.

## D. RLUIPA is Inapplicable to Article 27

The Congregation contends that the Stormwater Fee is a substantial burden on the religious exercise in violation of Religious Land Use and Institutionalized Persons Act of 2000, codified at 42 U.S.C. § 2000cc *et seq.* (2012). The Congregation maintains that RLUIPA is applicable here because Article 27 is a land use regulation and operates as a

43

zoning or landmarking law that limits or restricts the Congregation's use of the Properties. In support, the Congregation points to Article 27's calculation of the fee based on impervious surface and notes that the credit system incentivizes certain property usages. The Congregation also emphasizes that the Board—"of Municipal and *Zoning* Appeals"— has authority to preside over appeals.[20]

The City counters that Article 27 is not a land use regulation because it is neither a zoning law nor a landmarking law and, therefore, RLUIPA is inapplicable. Preliminarily, the City asserts that Article 27 is "separate and distinct" from the City's zoning laws and the City's historical and architectural preservation laws. It continues that Article 27 does not regulate how property is used—stating that it treats basketball courts and parking lots the same—nor does it restrict proposed uses of property.

RLUIPA "protects religious institutions from local governments that apply land use regulations in a discriminatory fashion or in a manner that imposes a substantial burden on religious exercise." *Bethel World Outreach Church v. Montgomery Cty.*, 184 Md. App. 572, 601 (2009) (citing 42 U.S.C. § 2000cc). In relevant part, RLUIPA provides the following:

> (a) Substantial burdens
>> (1) General Rule
>> No government shall impose or implement a land use regulation in a

---

[20] Unlike appeals of fees assessed by DPW, appeals of excise taxes do not typically go to the Board, but that does not alter the outcome of our decision. *See, e.g.*, *E. Diversified*, 319 Md. at 47, 55 (1990) (holding, in an appeal from the County Board of Appeals, that the development impact fee that the county imposed was actually a tax) *with* the follow-up case in *Waters Landing*, 337 Md. at 21-22, 33 (holding, in an appeal from the Tax Court, that the county may impose development taxes retroactively to encompass charges it levied previously as development impact fees).

manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--

> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

RLUIPA specifically defines what constitutes a land use regulation:

. . . [A] zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

42 U.S.C. § 2000cc-5(5).

Thus, to be a land use regulation, the government entity must prescribe how a property owner can develop or utilize its property under the color of a zoning or landmarking law. *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 434 (6th Cir. 2002). As case law illustrates, however, RLUIPA may apply even if a law is not categorized as a landmarking or zoning law. *See Fortress Bible Church v. Feiner*, 694 F.3d 208, 216-17 (2d Cir. 2012). For instance, in *Feiner*, the Second Circuit held that RLUIPA applied when a town used "a statutory environmental review process as the primary vehicle for making zoning decisions[.]" *Id.*

We agree with the City that RLUIPA is inapplicable. Article 27 is not a land use regulation because it does not impose use restrictions or regulate the use of property. Nothing in Article 27 restricts a property owner's use of land. Unlike in *Feiner*, the City

is not using Article 27 as a pretext or vehicle to enact or implement a zoning ordinance. *See id.* As the City notes in its brief, "the distinction strikes at the heart of RLUIPA's intent to scrutinize 'land use regulations,'" that could have the effect of prohibiting religious structures and institutions— such as a denial of a sewage category change for a proposed facility that effectively left a church without sufficient space for its congregation, essentially precluding the church "from having any structure requiring sewer service on its property." *See Trinity Assembly of God of Balt. City, Inc. v. People's Counsel for Balt. Cty.*, 407 Md. 53, 100 (2008) (discussing *Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766, 785-788 (D. Md. 2008). Article 27 simply treats a property owner's development of the land—as a single-family or non-single-family property and impervious area—as a proxy for how much stormwater run-off the property contributes to the stormwater system and, appropriately, how much the owner should contribute toward the stormwater management fund and related programs authorized under the statute for the public benefit. Consequently, we hold that Article 27 does not fall within RLUIPA's purview.

## III.

### The Board's Rules of Procedure

Finally, invoking the rule from *Pollock v. Patuxent Inst. Bd. Of Review,* 374 Md. 463, 502 (2003), the Congregation contends that vacatur of the Board's decision is required because the Board failed to follow its own procedures in considering the Congregation's substantial burden argument. According to the Congregation, it submitted to DPW "'detailed financial statements' in the form of its own water bills outlining how much in

stormwater assessments it was being assessed from September 2013 onward." These water bills, the Congregation suggests, were sufficient to demonstrate a substantial burden "given the small size of Shaarei Tfiloh[.]" Because the Board found the Congregation's substantial burden argument to be "unsubstantiated" despite the fact that the water bills were in DPW's record, the Congregation claims the Board must not have followed its own procedure, which requires DPW to submit to the Board "a complete record of the matter appealed." This failure, the Congregation continues, requires this Court to vacate the Board's decision and remand the case so that the Board can reconsider its substantial burden argument with a complete record.

The City agrees that the Congregation's water bills showed how much the Stormwater Fee was; however, it asserts that evidence of the link between that amount and the effect on the Congregation's financial status was lacking. We agree.

There is no evidence that the Board failed to follow its procedure. A water bill alone is not a financial statement, let alone a detailed one. Financial statements read together show a complete picture of the financial health of an organization at a given point in time. The water bill indicated one, isolated expense incurred by the Congregation, and when afforded the opportunity to explain about Stormwater Fee's burden, the Congregation replied that it had "a very modest budget" because it was "a small synagogue". The Congregation did not establish a nexus between the Stormwater Fee and its financial effect on the Congregation and, therefore, it did not provide the Board with a means to assess the

47

Stormwater Fee's impact on the Congregation's finances.[21]  We do not discern, on this record, any procedural failure by the Board that would have prejudiced the Congregation's argument.  Accordingly, we deny the Congregation's request to vacate Board's decision.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.  COSTS TO BE PAID BY APPELLANT.**

---

[21] Moreover, as we explained above, because RLUIPA does not apply to the instant action, and we will not adopt a more stringent standard for free-exercise claims brought under the Maryland Declaration of Rights, the Congregation's substantial burden argument mistakes the applicable standard.  Nevertheless, to the extent that the Congregation endeavored to demonstrate that paying the Stormwater Fee was beyond its financial capacity, the Board's reasoning that the Congregation failed to submit sufficient evidence stands.